[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Alexis, born September 9, 1989, was committed by agreement to the Department of Children and Youth Services (hereinafter DCYS) on September 26, 1990. The petition was filed on April 25, 1990. The adjudicated grounds were neglect (permitted to live under conditions, circumstances and associations injurious to her well being) and uncared for (homeless). The commitment was extended on March 4, 1992 to July 26, 1993. The father is unknown.
On August 16, 1991 a petition was filed to terminate the paternal rights of the twenty four year old mother on three statutory grounds. Gen. Stat. 17a-112(b)(1)(2)(3). On November 13, 1991 the petition was amended to include the fourth statutory ground. 17a-112(b)(4). All four grounds track the statutory language.
Mother and child have been represented by court appointed counsel.
The amended petition is granted.
 I
Public policy is to strengthen the family and provide a temporary or permanent environment when necessary. 17a-101a. But the parent should not be put under risk by placing a child in foster care. There must be strict compliance with statutory criteria to eliminate arbitrary decisions. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 420 A.2d 875 (1979). CT Page 3578
Termination is serious and sensitive judicial action. The right of parents undeniably deserve deference and, absent a powerful countervailing interest, protection. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 640-641, 436 A.2d 290
(1980).
 II
After being permanently removed from her own natural mother's care at about five years of age, the respondent mother had multiple placements before being adopted at age seven. As a child she had been sexually abused. By high school graduation she had a substance abuse problem. She also has a history of impulsive behavior. After graduation, unable to retain employment she held many jobs. Because of conflicts, the mother left her parents' home but returned about six months before birth of Alexis. She stopped using drugs and both mother and daughter were tested negative at birth. Because the mother refused responsibility for her child, the grandparents asked the mother to leave so the three-month old Alexis was placed in foster care in December 1989. The child has remained in the same foster care home since then — her entire life less three months.
A February 21, 1990 DCYS agreement required drug rehabilitation, twice weekly visitation and weekly calls to DCYS. Exhibit S-15. DCYS again prepared expectations on September 17, 1990 requiring three weekly AA meetings, weekly counseling, no drinking or substance abuse, and continued visitation; her continued relationship with her boyfriend Jim was dependent on his participation in counseling. She was warned of the consequences of failure. Exhibit S-9. Neither agreement was complied with.
During this period the mother was dependent on boyfriends for shelter and support, culminating with her relationship with Jim, a reputed substance abuser prone to violence.
At the time of commitment, the mother signed a Court Expectation Agreement. She agreed to cooperate with DCYS and Casey, visit the child, participate in individual and drug/alcohol counseling and thrice weekly A/AA sessions, procure adequate and secure housing, no substance abuse and no further criminal involvement. She was given fair warning of the consequences of failure. Exhibit S-16.
The location of Alexis was never a secret. In addition to the designated twice weekly schedule, visitation was possible every day except Thursday — but the mother never CT Page 3579 asked. However, the mother generally kept the basic schedule between January 1990 and March 1990, even though she was often tardy and the visits were short. From April through September 1990, she visited twenty times out of possible fifty-two.
In May 1990 the mother told the foster mother she might put the child up for adoption.
The mother did enter the drug-alcohol Rushford Rehabilitation Center on July 9, 1990 at the insistence of DCYS, but neglected any significant aftercare program. She had enrolled to avoid criminal sanctions.
In September 1990 after Rushford, the mother began drug therapy at the Bristol counseling Service. Despite the mother's significant history of substance abuse, she claimed she had ended drug and alcohol use prior to entering Rushford. She ended her AA involvement in the spring of 1991. Despite evidence to the contrary, she denies significant substance abuse which minimizes the impact of any rehabilitation efforts and her personal involvement in any such efforts. She was shy in the AA group atmosphere. Her severance from AA aftercare increases the risk of relapse. She discontinued her counseling at Bristol counseling on October 15, 1991 after a gap from August 16 when her second child was born; she resumed in December, about the time these hearings began. Although her home was within walking distance of Bristol counseling, she attended thirty out of forty four therapy sessions. The mother was not personally motivated for any therapy.
In late 1990 the mother was reminded of her expectations and the role of Jim in her life. DCYS wanted him personally rehabilitated or out of her life. In June 1991, the mother confided to the foster mother that when Alexis was returned, Jim would reunite. Although the mother now insists her relationship with Jim is platonic he is the father of her second child and will continue contact. The second daughter is not included in any juvenile proceeding. However, when the mother was three or four months pregnant she had made only feeble attempts at pre-natal care.
The mother neither visited or sent cards on Alexis's first and second birthday. Christmas presents were brought weeks after the holiday. A 1990 Christmas visit was feasible at the home of the grandparents but the mother failed to institute arrangements.
Prior to commitment, the mother had been evaluated by Casey Family Services (hereinafter Casey) with minimal success. Casey is an independent social service agency which provides in CT Page 3580 depth services. Casey closed its file on March 30, 1990 because the mother was using drugs and refused to enter a recommended inpatient treatment program. Exhibit S-1.
Because of the expertise of Casey, DCYS again engaged its services in May 1990 for a second period in order to reunite mother and daughter. A Reunification Service Agreement was executed by the mother, DCYS and Casey Family Services on July 5, 1990. Exhibit S-2. The Agreement lists the services available to the mother. An Intake Summary reported in August 1990 that Alexis had already bonded with the foster mother, not surprising having lived in that home since the age of three months. Casey was concerned about the mother's willingness to resolve her long range substance abuse problem. The mother also had emotional needs which had to be resolved before she could provide her daughter the parental support necessary to the child's well being, support which the mother perceives was lacking in her own youth. Exhibit S-3.
During the months that Casey was involved, it prepared summaries. After discharge from Rushford on August 7, 1990, the mother was advised to attend a minimum of three AA or NA meetings a week plus after care group therapy. She then lived at the YMCA which provided such services; she was asked to leave after one week. Despite a Section 8 Certificate obtained with the assistance of Casey, she insisted on living with Jim in Bristol although the foster home was in Newington. The mother had limited understanding of her child's needs, and had difficulty interacting with the child for more than twenty minutes. She seemed bewildered by the child. Exhibits S-4 and S-10. Jim did not become involved in counseling which might have supported the mother. Exhibit S-11. A pessimistic review of expectations efforts was prepared in December 1990. Exhibit S-12. In December 1990 the mother was given a tentative February 1 target date. The case update on February 1 showed the mother's fitful attempt at meeting expectations had not been successful. The mother did not meet her responsibilities for weekend visits. The mid week schedule had been met but Casey had the sole responsibility for transportation. Exhibit S-12. The record of the visits was not encouraging. The mother failed to initiate requests for aid in resolving any transportation problems. At times bus service was possible even if awkward.
Although Casey provided transportation, instruction in parenting skills, financial and budgeting assistance and crisis intervention, the Casey family support aide concluded on March 8, 1981 that the mother would need years of therapy on her own issues before she would be capable of adequate parenting; the child should wait no longer. Exhibit S-14. On the same date CT Page 3581 the Casey social worker completed a review of the file by noting the impersonal relationship of the mother with the child who views the foster mother as the primary parent. The worker concluded that reunification would place the child at high risk for neglect or abuse and that the child should not be denied a sense of permanency on the expectation that the mother will somehow develop parenting skills in the future. Exhibit S-5. The closing summary of Casey on May 6, 1991 described the services provided the mother whose situation was still unstable and recommended that termination be pursued by DCYS. Exhibit S-6.
So for a second time, Casey in early 1991 closed its file on this family. Casey was distressed by the mother's failure to visit or contact the foster mother regarding the child. The workers at Casey saw no mother/child bonding and were uncomfortable about the mother/child situation. The mother had made no progress in developing parenting skills.
DCYS made allowances for the mother to rehabilitate, even beyond Casey. At a June 1991 treatment plan review in presence of the mother's attorney, she was warned about a possible termination petition. After two more months, the petition was finally filed in August.
After these hearings began in these termination proceedings, the mother discussed consenting to termination with the foster mother; the mother later requesting a letter from the foster mother disclaiming the conversation. Once hearings began the mother did not visit her child.
Dr. David Mantell a licensed clinical psychologist evaluated the situation on two occasions. In connection with the commitment, on August 1, 1990 Dr. Mantell found the mother to be emotionally immature and limited person with difficult personal history, although she had a modest potential for acceptable adjustment. There was only a minimal interaction with the mother by the child who related to the foster mother. The mother's motivation for meaningful change did not always arise from a realistic evaluation of her situation, but was a reaction to mandate from agencies or the courts. Exhibit S-7. On October 1, 1991 when Dr. Mantell reevaluated the situation, the mother reported that Alexis knows her but not as a parent figure. While the child calls the mother "mommy" the child uses that term for adult females. The child knows the mother as a visitor and shows no anxiety on separation. The mother seemed aloof with the child. Dr. Mantell found no ongoing mother/child relationship. While the mother at the second interview appeared to have been sober for some time and had her own apartment, Dr. Mantell's previous evaluation remained the CT Page 3582 same: because of the mother's characteristics, she is not able to effectively relate to her daughter. Moreover, the mother does not believe she or her child need professional services. Dr. Mantell was pessimistic about a parent/child relationship that would be sustaining for the child. Because the mother has limited parenting ability — the birth of the second child has reduced the available resources for Alexis if divided between the two children. Exhibit S-8.
Testimony from a mental health professional is accorded great weight. In re Nicoline T., 9 Conn. App. 598, 605,520 A.2d 639 (1987).
While a DCYS study on termination was filed on August 18, 1991, Exhibit S-17, a DCYS study on the extension was filed February 3, 1992. The DCYS worker who prepared both reports also testified at the hearings. While the termination study conceded that the mother had made improvements in visitation, counseling and substance abuse, DCYS still had grave concerns about the mother's parenting ability. Because of the mother's inability to acquire basic skills in the past, DCYS concluded that it would not be in the best interest of Alexis, who needs a stable permanent home after years of foster care, to wait out the necessary changes in the mother.
The mother now rents a one bedroom apartment for herself and baby. Because of financial contributions from Jim, her back debts have been paid and she receives sufficient AFDC support. With the birth of the second child, however, visits with Alexis have been less frequent.
The attorney for the child supports the position of DCYS.
 III
Before terminating a parent/child relationship, the court must find by clear and convincing evidence, first, that one of the four statutory grounds has been established as of the date of the petition as amended and, second, that it is in the best interest of the child to terminate as of the hearings.
Abandonment focuses on the conduct of the parent. The parent should maintain a continuing reasonable degree of concern. Sporadic showing of interest, concern or responsibility can be statutory abandonment. In re Rayna M.13 Conn. App. 23, 35-38 534 A.2d 897 (1987). While the issue is close, the court, considering the mother's circumstances, does not find clear and convincing evidence that the mother failed to maintain a reasonable degree of interest, concern or CT Page 3583 responsibility for her child. 17a-112(b)(1).
The expectations executed by the mother illuminated her path to successful reunification. While she has made significant progress in housing, in income as the birth of her second child permitted an AFDC grant and in a platonic relationship with Jimmy as father of that child, there are still deficiencies in the mother's conduct and attitude toward substance abuse, parenting and services providers. Dr. Mantell saw no basic change in the mother between evaluations. The social workers do not give the mother a passing grade. Personal rehabilitation means return of the mother to a past constructive and useful role as a parent. In re Joshua A.,26 Conn. App. 58, 64, 597 A.2d 842 (1971) cert. denied. 221 Conn. 901,___ A.2d ___ (1992). The evidence clearly and convincingly shows that the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of Alexis she could assume a responsible position in the life of her daughter. 17a-112(b)(2).
A non custodial parent would almost automatically be deprived of the opportunity to provide the care, guidance or control necessary for the child's physical educational moral or emotional well being. 17a-112(b)(3). The court does not find clear and convincing evidence that this ground has been proven.
The court does find that there is no ongoing mother/child relationship that ordinarily develops as a result of a parent having met on a day to day basis the needs of the child. In this non custodial parent situation, there is no positive mother-child relationship. In re Jessica M.,217 Conn. 459, 586 A.2d 597 (1991). Under either circumstances, to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of this child. 17a-112(b)(4).
These statutory grounds have existed for not less than one year. In re Saba P., 13 Conn. App. 605, 538 A.2d 711
(1988). To extent, however, that one year has not expired prior to termination, the totality of the circumstances surrounding the child mandate a waiver as necessary to promote the best interest of the child. 17a-112(c).
 IV
In determining whether to terminate, the court must consider and make dispositional findings on six factors.17a-112(d). Supplementing the above findings, the court finds: CT Page 3584
(1) The services offered or provided to the mother were expansive and timely.
(2) While there was no court order, there were expectations. Those expectations have not fully been met. The fundamental issue of the mother's own personal problem and parenting skills have not been resolved by her. Adequate housing and income, while basic, are not sufficient in themselves to assure care, guidance or control necessary for a child's physical, educational, moral or emotional well-being. "(B)iological relationships are not (the) exclusive determina(nts) of the existence of a family." Smith v. Organization of Foster Families, 431 U.S. 816, 843, 97 S.Ct. 2094 (1977). The "process of parenting itself is multifaceted and encompasses all of life's activities." State v. Anonymous, 179 Conn. 155,164, 425 A.2d 939 (1979); In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 438 A.2d 801 (1981).
(3) The child has no particular feelings and emotional ties with her mother. Rather the child has developed ties to the foster mother. The child has been in the foster home since about December 12, 1989 when she was about three months old. The foster mother appears unlikely to adopt.
(4) The child is two years old and will be three on September 9, 1992.
(5) While the mother has made some adjustments to her circumstances conduct or condition to make in the best interest of the child to return her to her mother in the foreseeable, those adjustments have not been sufficient.
(6) The mother has not been prevented from maintaining a meaningful relationship with her daughter by unreasonable acts of anyone. Assistance has been offered. Economic circumstances of the mother have hampered her in housing and transportation, but her parent child problems really arise from her own personality. Hopefully she can overcome her handicaps as she starts anew with her second child.
The court finds that it is in the best interest of Alexis to terminate the parental rights of the mother in her daughter Alexis. There is the suggestion that the mother commendably wishes to spare her own daughter the anguish of her own childhood; unfortunately, the mother is not now equipped to do so. A carefully screened adoptive family should be able to do so, irrespective of any comparative material possessions.
V CT Page 3585
Reasonable efforts were made by the state to make it possible for he child to return home. Continuation in the home is contrary to the welfare of the child.
The parental rights of the mother in her daughter Alexis are terminated.
The Commissioner of the Department of Children and Youth Services is appointed statutory parent and should report to the court within ninety days on a case plan. At least every twelve months thereafter a report shall be made on the implementation of the plan. 17G-112(i).
A treatment plan/administrative review shall be filed by June 30, 1992.
SAMUEL S. GOLDSTEIN, Judge